## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| LYNN TILTON, *et al.*, | |
| Appellants, | |
| v. | Case No. 1:22-cv-00400 (TLA) |
| MBIA INC., *et al.*, | |
| Appellees. | |

## <u>OPENING BRIEF OF APPELLANTS</u>

Dated:      May 16, 2022

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

**SHER TREMONTE LLP**
Theresa Trzaskoma (*pro hac vice*)
Max Tanner (*pro hac vice*)
Wesley Erdelack (*pro hac vice*)
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtanner@shertremonte.com
werdelack@shertremonte.com

*Counsel to Appellants*

---

[1] The Debtors, and, where applicable, the last four digits of each of their respective taxpayer identification numbers, are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is c/o FTI Consulting, Inc., 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Appellants state as follows:

1.     The following corporations own, either directly or indirectly, 10% or more of the membership interests in Octaluna, LLC: Patriarch Partners VIII, LLC and Zohar Holding, LLC.

2.     The following corporations own, either directly or indirectly, 10% or more of the membership interests in Octaluna II, LLC: Ark Angels III, LLC; Patriarch Partners XIV, LLC; and Zohar Holding, LLC.

3.     The following corporations own, either directly or indirectly, 10% or more of the membership interests in Octaluna III, LLC: Patriarch Partners XV, LLC; Phoenix VIII, LLC, Ark II CLO 2001-1, Ltd.; and Zohar Holding, LLC.

4.     The following corporation owns, either directly or indirectly, 10% or more of the membership interests in Patriarch Partners VIII, LLC: Zohar Holding, LLC.

5.     The following corporation owns, either directly or indirectly, 10% or more of the membership interests in Patriarch Partners XIV, LLC: Zohar Holding, LLC.

6.     The following corporation owns, either directly or indirectly, 10% or more of the membership interests in Patriarch Partners XV, LLC: Zohar Holding, LLC.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

SUMMARY OF ARGUMENT ................................................................ 1

BASIS OF APPELLATE JURISDICTION ............................................. 4

ISSUES PRESENTED ............................................................................ 6

STANDARD OF APPELLATE REVIEW .............................................. 6

STATEMENT OF THE CASE ................................................................ 8

A. Ms. Tilton Creates the Zohar Funds ......................................... 8

B. The Portfolio Company Equity ................................................ 11

C. MBIA's Steal-the-Equity Strategy .......................................... 12

D. MBIA Assures Patriarch That It Will Support an Extension of the Zohar I Maturity Date and a Global Restructuring of the Zohar Funds ..................................................................................... 14

E. MBIA Encouraged the SEC to Investigate Ms. Tilton and Patriarch, and Colludes with the SEC Against Them, But the SEC Dismisses All Charges ............................................................. 18

F. MBIA Induces Ms. Tilton to Resign as Collateral Manager on False Pretenses .......................................................................... 20

G. MBIA Directs US Bank to Sell the Zohar I Collateral in a Commercially Unreasonable Auction ....................................... 21

H. MBIA and the Zohar III Controlling Class Launch a Litigation Campaign Against Patriarch ...................................................... 24

LEGAL STANDARD ........................................................................... 28

ARGUMENT ......................................................................... 29

i

I.      The Bankruptcy Court Erred in Holding that MBIA's Conduct
        in the Zohar I Maturity Extension and Restructuring
        Negotiations Did Not Constitute Inequitable Conduct............29

II.     The Bankruptcy Court Erred in Holding That MBIA's
        Encouragement of an Unsubstantiated Enforcement Action
        Did Not Constitute Inequitable Conduct. ................................35

III.    The Bankruptcy Court Erred in Holding That Collateral
        Estoppel Barred Patriarch's Claims Regarding AMZM's
        Damaging Litigation Campaign and MBIA's Inducement
        of Ms. Tilton's Resignation As Collateral Manager................39

IV.     The Bankruptcy Court Erred in Holding That US Bank's and
        MBIA's staging of the Commercially Unreasonable Zohar I
        Auction Did Not Constitute Inequitable Conduct. .................47

CONCLUSION.........................................................................................50

CERTIFICATE OF COMPLIANCE.......................................................1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16630 Southfield L.P. v. Flagstar Bank, F.S.B.*,
   727 F.3d 502 (6th Cir. 2013) ........................................................................1

*Anjelino v. New York Times Co.*,
   200 F.3d 73 (3d Cir. 1999) ...........................................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................................7

*Bagic v. Univ. of Pittsburgh*,
   773 F. App'x 84 (3d Cir. 2019) ...............................................................8, 35

*Benjamin v. Diamond (In re Mobile Steel, Co.)*,
   563 F.2d 692 (5th Cir.1977) .......................................................................28

*Brown v. Felsen*,
   442 U.S. 127 (1979)...............................................................................3, 41

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
   323 F.3d 228 (3d Cir. 2003) .......................................................................45

*Connelly v. Lane Const. Corp.*,
   809 F.3d 780 (3d Cir. 2016) .........................................................................7

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
   822 F.2d 1242 (2d Cir. 1987) .....................................................................36

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) .........................................................................7

*Freedman v. Redstone*,
   753 F.3d 416 (3d Cir. 2014) ..................................................................3, 41

*Graff v. Subbiah Cardiology Associates, Ltd.*,
   No. 08–207, 2008 WL 2312671 (W.D. Pa. June 4, 2008) .............................8

*Gregory v. Chehi*,
　843 F.2d 111 (3d Cir. 1988) ................................................................... 42, 46

*Grogan v. Garner*,
　498 U.S. 279 (1991)................................................................................ 41, 43

*In re Ashinc Corp.*,
　629 B.R. 154 (Bankr. D. Del. 2021)...............................................................44

*In re Astroline Commc'ns Co.*,
　226 B.R. 324 (Bankr. D. Conn. 1998).............................................. 41, 42, 43

*In re Docteroff*,
　133 F.3d 210 (3d Cir. 1997) .........................................................................40

*In re Energy Future Holdings Corp.*,
　No. BR 14-10979-CSS, 2017 WL 1170830 (D. Del. Mar. 28, 2017).........5, 7

*In re Epic Cap. Corp.*,
　307 B.R. 767 (D. Del. 2004)............................................................................6

*In re Epic Capital Corp.*,
　290 B.R. 514 (Bankr. D. Del.2003)...............................................................28

*In re Odyssey Contracting Corp.*,
　944 F.3d 483 (3d Cir. 2019) ...........................................................................5

*In re Optim Energy, LLC*,
　527 B.R. 169 (D. Del. 2015)..........................................................................28

*In re Prof'l Ins. Mgmt.*,
　285 F.3d 268 (3d Cir. 2002) ...........................................................................5

*In re Ross*,
　602 F.2d 604 (3d Cir. 1979) ............................................................. 4, 41, 44

*In re White Beauty View, Inc.*,
　841 F.2d 524 (3d Cir. 1988) ...........................................................................5

iv

*Krasner v. Rahfco Funds LP*,
    No. 11 CV 4092 VB, 2012 WL 4069300 (S.D.N.Y. Aug. 9, 2012) ............36

*O'Halloran, et al. v. Prudential Savings Bank* (*In re Island View Crossing II, L.P.*),
    604 B.R. 181 (E.D. Penn. 2019) .................................................................44

*Pepper v. Litton*,
    308 U.S. 295 (1939) ...................................................................................44

*Riley v. Kennedy*,
    553 U.S. 406 (2008) .....................................................................................5

*Schubert v. Lucent Tech., Inc.* (*In re Winstar Commc'ns, Inc.*),
    554 F.3d 382 (3d Cir. 2009) ........................................... 28, 29, 44

*Tender Touch Rehab Servs., LLC v. Brighten at Bryn Mawr*,
    No. CIV.A. 11-7016, 2012 WL 993532 (E.D. Pa. Mar. 23, 2012) ..............36

*United States v. State St. Bank & Tr. Co.*,
    520 B.R. 29 (Bankr. D. Del. 2014) ..............................................................29

*Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*,
    2021 WL 4460547 (S.D.N.Y. Sept. 29, 2021) ............................................40

**Statutes**

11 U.S.C § 101(31)(B) ......................................................................................29

11 U.S.C. § 510(c) ...........................................................................................28

28 U.S.C. § 158(a)(1) .........................................................................................4

**Rules**

Fed. R. Bankr. P. 8013(f)(3)(A) .........................................................................52

Fed. R. Bankr. P. 8015 ......................................................................................52

**Other Authorities**

*Restatement (Second) of Judgments* § 13 (1982) .............................................4

## SUMMARY OF ARGUMENT

Lynn Tilton, the Patriarch Entities, and the Octaluna Entities (collectively, "Patriarch" or "Plaintiffs")[2] appeal from the Bankruptcy Court's order ("Order") dismissing the Amended Complaint, A-74–117,[3] which Plaintiffs respectfully submit is premised on the Bankruptcy Court's misapplication of Rule 12(b)(6) and the doctrine of collateral estoppel.

*First*, in dismissing the claim that MBIA acted inequitably with respect to a secret collusive agreement between MBIA and the SEC, the Bankruptcy Court misapplied the legal standard on a motion to dismiss by crediting Defendants' version of events. On a motion to dismiss, the court should not decide between competing plausible theories; if a complaint alleges a plausible theory of liability, "the mere existence of more likely alternative explanations does not automatically entitle a defendant to dismissal . . . . Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *16630 Southfield L.P. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013) (internal quotation marks and citation omitted).

---

[2] Capitalized terms not otherwise defined have the meanings ascribed to them in the Order. A-74–117.

[3] Citations to the form "A-__" are to the Appendix being filed herewith.

The Bankruptcy Court misapplied this standard by weighing the likelihood of competing inferences in the Amended Complaint, improperly rejecting Plaintiffs' allegations, including by making the following factual determinations:

- It was unlikely that MBIA would string Ms. Tilton along in the Zohar I maturity extension and Zohar I restructuring negotiations, and cause Zohar I to default, given MBIA's serious financial distress, A-109.

- It was more likely that MBIA favored a Zohar I default for the limited purpose of gaining leverage to consensually restructure Zohar II, A-109–110.

- It was unlikely that MBIA would pursue the risky "steal-the-equity" strategy described in the Amended Complaint given MBIA's financial distress, *id.*

- The misinformation MBIA gave to the SEC could not have played a causal role in the SEC's decision to bring an enforcement proceeding against Ms. Tilton and the Patriarch Entities, A-110.

- The confidential Portfolio Company information MBIA received in the SEC investigation was likely cumulative of information MBIA had already received from other sources, and thus did not advance MBIA's interests, A-111.

- The likeliest reason Ms. Tilton did not exercise her "first look" rights with respect to the Zohar I collateral was that the Zohar I collateral was not, in fact, undervalued at auction. A-96.

Given that Plaintiffs plausibly and coherently allege that MBIA misled Ms. Tilton during the Zohar I maturity extension negotiations, colluded with the SEC to encourage an investigation and gain access to confidential Portfolio Company information, and staged a commercially unreasonable auction of the Zohar I collateral, it was error for the Bankruptcy Court to conclude that there were

alternative plausible explanations for that conduct which would exonerate Defendants.

*Second*, the Bankruptcy Court erred in holding that the doctrine of collateral estoppel, or issue preclusion, barred Plaintiffs from alleging that AMZM's campaign of malicious and value-destroying litigation against the Patriarch Entities—instigated by MBIA and the Zohar III Controlling Class—constituted inequitable conduct. Specifically, the Bankruptcy Court held that a decision in a separate proceeding that this litigation campaign did not constitute a breach of AMZM's contractual duties precluded Plaintiffs from alleging that the campaign amounted to inequitable conduct. A-100–101. However, for issue preclusion to apply, the issue determined in the prior proceeding must be "*identical* to the issue in the present proceeding." *Freedman v. Redstone*, 753 F.3d 416, 425 (3d Cir. 2014) (emphasis added). Further, collateral estoppel is appropriate only where a prior court proceeding adjudicated "factual issues using standards identical to those [of the bankruptcy code]." *Brown v. Felsen*, 442 U.S. 127, 139 n.10 (1979). Because the legal standards governing the breach of contract claim in the prior proceeding are narrower than those applied to a claim for equitable subordination, the issues are not identical and collateral estoppel should not apply.

The Bankruptcy Court also erred in holding that the prior decision had determined the issue of Defendants' motivations. A-100. In support of their claim

for equitable subordination, Plaintiffs plausibly allege that the litigation campaign—whatever its objective legal merits—was designed to harm and harass Ms. Tilton and the Patriarch Entities. A-6, 9, 40, 41, 59, 64. The Bankruptcy Court's conclusion that the prior decision foreclosed such a wrongful motivation because the prior decision had found the litigations to be nonfrivolous is incorrect as a matter of interpretation and a matter of law. The prior decision made no reference to Defendants' motivations, either implicitly or explicitly, and collateral estoppel is limited to those issues that are "essential to the prior judgment." *In re Ross*, 602 F.2d 604, 608 (3d Cir. 1979). Because the motivations underlying Defendants' litigation campaign were irrelevant to the prior proceeding,[4] the Bankruptcy Court erred in holding that the prior proceeding barred it from crediting Plaintiffs' allegations for purposes of deciding Defendants' motion to dismiss.

## BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction to hear appeals from all "final judgments, orders, and decrees" of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). In the Third Circuit, "considerations unique to bankruptcy appeals require construing finality in

---

[4] Further, the SDNY decision was not a final judgment, as it did not dispose of all the claims in that action. As a matter of law, Plaintiffs have not had an opportunity to obtain review, which weighs against application of collateral estoppel. *See Restatement (Second) of Judgments* § 13 (1982) (in determining whether a previous decision was sufficiently definite that collateral estoppel applies, court should consider whether "the decision was subject to appeal or was in fact reviewed on appeal").

a more pragmatic, functional sense." *In re Odyssey Contracting Corp.*, 944 F.3d 483, 486 (3d Cir. 2019) (quoting *In re Prof'l Ins. Mgmt.*, 285 F.3d 268, 279 (3d Cir. 2002)) (internal quotations and alterations omitted). To determine whether an order deciding an adversary proceeding within a bankruptcy case is final, courts in the Third Circuit "apply the same concepts of appealability as those used in general civil litigation," *In re Odyssey Contracting Corp.*, 944 F.3d 483, 486 (3d Cir. 2019) (quoting *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988)), and "[o]rdinarily in civil litigation . . . orders that dispose of all issues as to all parties to the case are considered final," *In re Pro. Ins. Mgmt.*, 285 F.3d 268, 279 (3d Cir. 2002). *See also In re Odyssey Contracting Corp.*, 944 F.3d 483, 486 (3d Cir. 2019) (quoting *Riley v. Kennedy*, 553 U.S. 406, 419 (2008)) ("A final judgment is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."). Under this standard, a bankruptcy court's "order ending a separate adversary proceeding is appealable as a final order even though that order does not conclude the entire bankruptcy case." *In re Odyssey Contracting Corp.*, 944 F.3d 483, 486 (3d Cir. 2019). *See generally In re Energy Future Holdings Corp.*, No. BR 14-10979-CSS, 2017 WL 1170830 (D. Del. Mar. 28, 2017), *aff'd*, 748 F. App'x 455 (3d Cir. 2018) (treating an order dismissing an adversary proceeding with prejudice as final and exercising appellate jurisdiction). In this case, the Bankruptcy Court "dismisse[d] the Amended Complaint against all [Appellees] without leave to

amend." The Bankruptcy Court thus disposed of all issues as to all parties, leaving nothing for it to do but execute the judgment. Therefore, the Order is final, and this Court has jurisdiction over this appeal.

## ISSUES PRESENTED

1.    Did the Bankruptcy Court err in finding that Appellants failed to state a claim, including by not drawing all reasonable inferences in Appellants' favor?

2.    Did the Bankruptcy Court err in holding that the doctrine of collateral estoppel barred the Amended Complaint's allegations that Appellees behaved inequitably?

3.    Did the Bankruptcy Court err in holding that Appellants failed to sufficiently allege that Appellees' conduct with regard to the auction of the Zohar I collateral amounted to inequitable conduct justifying subordination?

4.    Did the Bankruptcy Court err in holding that Appellants failed to sufficiently allege that Appellees acted with an improper purpose that amounted to inequitable conduct justifying subordination?

## STANDARD OF APPELLATE REVIEW

This Court reviews "the Bankruptcy Court's legal conclusions under the *de novo* standard of review and its factual determinations under the clearly erroneous standard of review." *In re Epic Cap. Corp.*, 307 B.R. 767, 771 (D. Del. 2004). Therefore, a dismissal of claims under Rule 12(b)(6) is reviewed *de novo* on appeal.

*See In re Energy Future Holdings Corp.*, 2017 WL 1170830, at *3 ("Since the matter being reviewed here is a motion to dismiss, review is *de novo*.").

As set forth in the Order, the Bankruptcy Court dismissed the Amended Complaint because it found that the Appellants did not state a plausible claim for relief pursuant to Rule 12(b)(6) against any of the Appellees. Accordingly, this Court reviews the Bankruptcy Court's legal conclusions *de novo*.

When reviewing the sufficiency of a complaint, the reviewing court "must take three steps. First, it must take note of the elements the plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 and 679 (2009)) (internal citations and quotation marks omitted). When the reviewing court "affirmatively disregards a pleading's legal conclusions, it must still . . . assume all remaining factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Connelly*, 809 F.3d at 790.

However, a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler v.*

*UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Graff v. Subbiah Cardiology Associates, Ltd.*, No. 08–207, 2008 WL 2312671 (W.D. Pa. June 4, 2008) (internal quotation marks omitted). The reviewing court "may not weigh the credibility of the parties' positions on a question of disputed material fact at the motion to dismiss stage, but rather should leave such considerations to a jury." *Bagic v. Univ. of Pittsburgh*, 773 F. App'x 84, 87 (3d Cir. 2019) (quoting *Anjelino v. New York Times Co.*, 200 F.3d 73, 97 (3d Cir. 1999)) (internal citations and quotation marks omitted). Furthermore, the reviewing court "cannot weigh competing inferences and forgo drawing a reasonable one in the plaintiff's favor." *Bagic*, 773 F. App'x at 88–89.

## STATEMENT OF THE CASE

### A.  Ms. Tilton Creates the Zohar Funds.

Appellant Lynn Tilton created the Zohar Funds, which are a type of investment vehicle known as a "collateralized loan obligation" or "CLO." A-16–17. The Zohar Funds raised capital by issuing notes to investors entitling them to interest payments over time, plus return of their principal at stated maturity dates. A-17. The Zohar Funds' investment strategy involved using those funds to originate high-interest loans to certain distressed companies (the "Portfolio Companies"), principally undervalued iconic American brands. *Id*. Each Zohar Fund was governed by an Indenture, Collateral Management Agreement ("CMA") and Collateral

8

Administration Agreement ("CAA"), each of which were heavily negotiated by multiple sophisticated parties. A-18–19. Until 2016, the Patriarch Entities and other Tilton-affiliated entities served as the collateral manager for each Zohar Fund. A-4, 45.

The investment strategy and value proposition of the Zohar Funds differed in crucial respects from those of traditional CLOs. A-20. While most CLOs involved highly rated and well-performing debt, the Zohar Funds primarily acquired distressed and nonperforming debt on the secondary market. *Id*. The Zohar Funds also originated loans at high interest rates to distressed companies who were otherwise unlikely to meet their capital financing needs through standard lending. *Id*.

The strategy underlying the Zohar Funds was twofold. It depended on Ms. Tilton's ability, as the Funds' collateral manager, to control the terms of the loans in the Zohar Funds' portfolio. A-20. The strategy further depended on Ms. Tilton controlling and rehabilitating the Portfolio Companies from the inside, typically by acting as the Portfolio Companies' director or manager and, in some cases, CEO. A-20–21. Ms. Tilton had significant skin in the game. Not only was she the Zohar Funds' preference shareholder, but, through her investment vehicles, she separately invested in loans and equity of the Portfolio Companies. A-21–22. And through two other affiliates, Patriarch Partners Management Group, LLC and Patriarch Partners

Agency Services, LLC, Ms. Tilton, and the Patriarch team provided operational and advisory services to the Portfolio Companies and served as administrative agent under the credit agreements between the Portfolio Companies and their secured lenders. A-20–21. That is, the Zohar Funds' noteholders invested with the understanding that the Funds' success depended on Ms. Tilton's financial and managerial expertise.

The Zohar Funds' noteholders were entitled to the payment of principal and interest generated by the loans held by the funds. A-17. While it was anticipated that some of the Zohar Funds' loans would underperform, the strategy underlying the Funds contemplated that the loan portfolio as a whole—bolstered by the more successful turnarounds—would collectively generate cash sufficient to meet the notes' repayment obligations. *Id*. After payment of certain fees and expenses and repayment of the interest and principal due on the notes, any excess value generated by the Zohar Funds flowed up to Ms. Tilton as the Zohar Funds' preference shareholder. A-19.[5]

The transaction that created Zohar I closed in 2003. A-18. Zohar II and Zohar III were created in 2005 and 2007, respectively, to loan side-by-side with Zohar I pursuant to the same investment strategy. *Id*. The Zohar I notes were set to

---

[5] Ms. Tilton owned preference shares of each Zohar Fund through a series of wholly owned investment vehicles—Octaluna I, LLC, Octaluna II, LLC, and Octaluna III, LLC—collectively called the "Octaluna Entities." *See, e.g.*, A-21.

mature in November 2015. A-30. On this date, Zohar I's noteholders—the A-1 Noteholder, the A-2 Noteholder (MBIA, Inc.), and the A-3 Noteholder[6]—were all due principal and accrued interest from Zohar I. *Id*. The Zohar II notes were scheduled to mature in January 2017 and the Zohar III Notes were scheduled to mature in April 2019.[7] *Id*.

MBIA Insurance provided an insurance guaranty for the Class A notes of Zohar I and II, providing that if the Zohar I and II were ultimately unable to meet their payment obligations on the notes, then MBIA would do so. A-19. In this capacity, MBIA acted as the Funds' "credit enhancer"[8] and, for this reason, MBIA was closely involved in negotiating the Zohar I and II Indentures and shaping nearly all terms of the transaction. *Id*. MBIA Insurance did not insure notes for Zohar III. *Id*. As such, the Zohar III Indenture vests the noteholders of the Zohar III notes controlling-party status, and they are collectively referred to as the "Zohar III Controlling Class." *Id*.

## B.    The Portfolio Company Equity

Because equity ownership could result in significant tax and other liabilities

---

[6] The identities of the A-1 Noteholder and the A-3 Noteholder are not public. *See* A-30.

[7] Each of the Zohar funds also issued Class B notes, which are held by the Octaluna Entities. A-10.

[8] The Zohar indentures define the party providing insurance policies on the Zohar notes as the "Credit Enhancer" for the funds.

for the Zohar Funds, the ratings agencies responsible for rating the Zohar Funds' notes insisted that the Zohar Funds could not purchase common equity and, generally, not own equity in the Portfolio Companies. A-22. For this reason, Ms. Tilton (through her Octaluna Entities) agreed to own the Portfolio Company equity of the Zohar Funds and the equity ownership of the Zohar Funds themselves, and to bear the tax consequences associated with that ownership. *Id.* Though Ms. Tilton owned this equity, certain equity interests were put in the Zohar Funds' name as "record holder" to memorialize the funds' limited right to receive the net proceeds from the sale of any Portfolio Company equity after repaying expenses and noteholder obligations. A-23. The Indentures and other governing documents expressly prohibited the Zohar Funds (subject to certain narrow exceptions) from owning equity. *Id.* This structure was understood by the ratings agencies, Ms. Tilton, and the noteholders who signed onto the Zohar transaction at closing. A-22. This ownership and control structure was honored from the formation of the Zohar Funds and was repeatedly acknowledged both publicly and privately by the major stakeholders in the Zohar Funds and by MBIA in particular. A-4, 25–27.

## C.    MBIA's Steal-the-Equity Strategy

As described more fully below, MBIA began to struggle financially in the wake of 2008's global financial crisis, which generated substantial insurance losses for the company. A-29–30. In particular, MBIA was exposed to significant losses

12

stemming from its guaranties on structured financial products tied to the commercial and residential real estate markets. A-28. In 2008 and 2009, Moody's and S&P downgraded MBIA Insurance's credit rating in light of its mortgage related exposures and anticipated declines in new business. *Id*. This downgrade prevented MBIA from writing meaningful new insurance business from 2008 until at least the end of 2011. A-29. MBIA also faced significant exposure to Puerto Rico's debt crisis, as it had billions of dollars of insurance obligations related to Puerto Rico debt. *Id*.

Faced with these financial pressures, and the prospect of being put into rehabilitation by the New York Department of Financial Services, MBIA developed a strategy to acquire desperately needed liquidity and assets to meet its mounting insurance obligations. A-29, 37–41. The contours of this scheme evolved over time, but at its core was MBIA's belief that the value of the Portfolio Company equity could exceed (perhaps greatly exceed) MBIA's insurance obligations to the Zohar I and II noteholders in the event of a default on the Class A notes. A-37–41. Accordingly, MBIA devised a plan to take control of and ultimately sell the Portfolio Companies. The excess value of the Portfolio Companies' equity over MBIA's obligations would have provided a windfall to MBIA that it could have used to mitigate losses in other areas of its insurance portfolio. A-46. As described in the Amended Complaint, in executing this plan MBIA waged a campaign of deceptive

13

and inequitable conduct towards Ms. Tilton. A-43–46.

## D.    MBIA Assures Patriarch That It Will Support an Extension of the Zohar I Maturity Date and a Global Restructuring of the Zohar Funds

In 2008 and 2009, the global financial crisis's negative impact on the Portfolio Companies became clear, raising the prospect that their financial distress could prevent Zohar I from repaying its noteholders at its November 20, 2015 maturity date. A-30. Anticipating this issue, Ms. Tilton began discussions with the Zohar I noteholders to extend the maturity date to align with the Zohar II notes' January 2017 maturity date. *Id.*

On October 5, 2012, Ms. Tilton and the Zohar I noteholders met. Ms. Tilton explained to MBIA and to the other noteholders that extending the Zohar I maturity would have several benefits to all parties, including avoiding disparate treatment of the Portfolio Companies and allowing the Funds to monetize the Portfolio Companies in the ordinary course without the prospect of imminent defaults creating "fire sale" conditions. A-31–32. Ms. Tilton also explained that such an extension would require the consent of all the Zohar I noteholders. *Id.* At this meeting, MBIA executive Anthony McKiernan expressed interest in Ms. Tilton's proposal. A-31. MBIA also made it clear that it understood that maximizing the value of the Portfolio Companies by selling them under the best possible conditions was in the best interests of all the Zohar Funds' stakeholders, MBIA included. A-32.

On March 8, 2013, Mr. McKiernan and Ms. Tilton held a conference call to

discuss the terms of a Zohar I extension. *Id*. During this call, Mr. McKiernan outlined extension terms acceptable to MBIA and it was agreed that Plaintiffs would draft a term sheet they could present to all Zohar I noteholders. *Id*.

On March 15, 2013, Ms. Tilton circulated the term sheet to Mr. McKiernan and the A-3 Noteholder outlining the terms for extending the Zohar I maturity date to January 2017. A-33. This proposal reflected many terms incorporated at MBIA's explicit request. *Id*. On May 30, 2013, Mr. McKiernan circulated a revised version of the term sheet which altered certain terms but included the proposal to extend the Zohar I maturity date. *Id*. On August 9, 2013, Mr. McKiernan also wrote Ms. Tilton, telling her that he was planning to meet directly with the A-3 Noteholder regarding the extension. *Id*.

By October 2013, it became clear that, although MBIA had expressed interest in extending the Zohar I maturity date, MBIA was unwilling to agree to the March 2013 term sheet. *Id*. Seeking an alternative solution that would make a Zohar I extension satisfactory to all parties and maximize the value of all the Zohar Funds, Ms. Tilton retained Moelis & Company ("Moelis") to formulate a new proposal encompassing a global restructuring of all three Zohar Funds. *Id*. Patriarch and MBIA both understood that extending the Zohar I maturity date, making the Zohar I and II maturities coterminous, was a necessary first step in this effort. *Id*.

From the end of 2013 through 2015, Patriarch, Moelis, and MBIA continued

discussions regarding an overall restructuring of the Zohar Funds. *Id*. During this period Mr. McKiernan met with Ms. Tilton on a monthly basis and they further spoke via telephone on a near-weekly basis. A-33–34. Mr. McKiernan consistently expressed MBIA's view that its interests were aligned with those of Patriarch, and that it supported Ms. Tilton's efforts to negotiate an extension of the Zohar I maturity date as part of her global restructuring effort. A-34. During this period, Patriarch expended significant time and resources satisfying MBIA's requests for information (including for confidential information), which MBIA claimed was necessary to evaluate Patriarch's global restructuring proposals. *Id*.

During the first part of 2014, Ms. Tilton and Moelis developed a restructuring proposal in which Patriarch would use certain Portfolio Companies as collateral to raise outside capital and use that capital (along with cash contributions from Ms. Tilton and MBIA) to buy out the existing noteholders of all three Zohar Funds. *Id*. In June 2014, Deutsche Bank expressed interest in financing this proposal. *Id*. Representatives of Deutsche Bank, Moelis, and Patriarch met to iron out the details of this proposal, which ultimately took the form of a term sheet Ms. Tilton presented to MBIA. *Id*. Despite continuing discussions through December 2014 between MBIA and Patriarch regarding this proposal, MBIA ultimately refused to agree. A-35.

On February 17, 2015, representatives of Patriarch and MBIA (and their

respective advisors) held a meeting to discuss Zohar I's impending November 20, 2015 maturity date and the state of restructuring negotiations. *Id*. At this meeting, Mr. McKiernan again assured Patriarch that MBIA favored a global restructuring. *Id*.

On March 3, 2015, Moody's announced that it had put MBIA Insurance's financial strength rating on "negative" outlook to reflect the significant financial strain that potential Zohar I and Zohar II defaults would impose on MBIA's capital and liquidity profiles. A-35–36. Mr. McKiernan wrote Ms. Tilton on March 25, 2015, and again stated that MBIA was intent on continuing the February 17 discussions to resolve the Zohar Funds' outstanding issues. A-36.

On April 13, 2015, after two years of negotiations, MBIA's counsel informed Ms. Tilton's attorneys *for the first time* that MBIA would not consent to a Zohar I extension without further concessions. *Id*. Mr. McKiernan wrote Ms. Tilton, stating that MBIA would now need additional financial information from the Portfolio Companies to assess whether a Zohar I extension was in MBIA's best interest. *Id*. Providing this information had not been a precondition for MBIA's consent to a Zohar I extension in the past and Patriarch had already provided substantial information to MBIA on many occasions over the preceding several years in connection with their restructuring talks. *Id*.

Notwithstanding the prior two years of negotiations and various proposals

17

made by Ms. Tilton, on an August 5, 2015 earnings call, Edward Chaplin, CAO and CFO of MBIA, Inc., stated that "while we believe that a global negotiated solution that would refinance or restructure the Zohar's CDO is in the best interest of all parties, a proposal to that end has not materialized at this point . . . ." A-37. As Ms. Tilton remarked in a letter to MBIA responding to this call, this statement was neither a fair nor correct assessment of the parties' negotiations. She noted that "contrary to [MBIA's] assertions on the earning call, Patriarch has for at least the last two years continuously sought to engage MBIA in conversations regarding a restructure of the Zohar funds," and that "Patriarch hired Moelis in connection [with] such efforts and a number of restructuring proposals were made to MBIA." *Id*.

Ultimately, MBIA and Ms. Tilton did not reach a negotiated restructuring of Zohar I, which defaulted in November 2015, and Ms. Tilton and Patriarch Partners XV filed for the involuntary bankruptcy of Zohar I on November 22, 2015. A-44.

**E.     MBIA Encouraged the SEC to Investigate Ms. Tilton and Patriarch, and Colludes with the SEC Against Them, But the SEC Dismisses All Charges**

While MBIA was negotiating with Ms. Tilton regarding the Zohar I maturity date extension, MBIA was (unbeknownst to Ms. Tilton) also engaging in clandestine communications with the Securities and Exchange Commission (the "SEC") regarding Ms. Tilton, Patriarch, and the Zohar Funds. A-40. MBIA encouraged the SEC investigation into Ms. Tilton and Patriarch in furtherance of its efforts to

capture the Portfolio Companies' equity for itself. *Id.* In that regard, MBIA took advantage of the SEC investigation to gain access to confidential information regarding the Portfolio Companies to which it was not entitled and to feed the agency misinformation in an attempt to encourage an SEC enforcement action against Ms. Tilton and Patriarch. *Id.*

In late 2013 and early 2014, MBIA entered into a secret agreement with the SEC to obtain confidential, nonpublic Portfolio Company information the SEC had subpoenaed from Ms. Tilton. A-41. The SEC told MBIA that it could use this confidential information to commence litigation against Ms. Tilton and her related entities. A-41–42. MBIA, in turn, insisted that the SEC not inform Ms. Tilton it had released these documents to MBIA without first informing MBIA. A-41. The confidential information MBIA received from the SEC confirmed that certain of the Portfolio Companies had retained substantial value despite the global economic crisis. A-42.

The SEC, accepting MBIA's illegitimate and self-serving version of the facts, commenced a civil fraud investigation and administrative enforcement action against Ms. Tilton and the Patriarch Entities. *Id.* This proceeding rendered certain restructuring options unavailable and increased the likelihood of a Zohar I default. *Id.*

After a three-week trial in 2017, Ms. Tilton, Patriarch Partners, LLC, and the

Patriarch Entities ultimately won a complete dismissal of all charges. *Id*.

## F.   MBIA Induces Ms. Tilton to Resign as Collateral Manager on False Pretenses

As alleged in the Amended Complaint, MBIA recognized that gaining access to the Portfolio Companies' equity required replacing Ms. Tilton as the Zohar Funds' collateral manager with a collateral manager beholden to MBIA and collaborating with that successor collateral manager in a litigation effort to take control of the Portfolio Companies. A-43. The first step of this strategy was hampered by the fact that, at the time MBIA formulated this strategy, neither MBIA nor the Zohar III Controlling Class had any basis under the Indentures or Collateral Management Agreements to remove Ms. Tilton as the collateral manager of Zohar II and III. *See id*. For this reason, MBIA needed to induce Ms. Tilton's voluntarily resignation. A-43–44.

In 2015, MBIA through Mr. McKiernan took the first step in this strategy by giving Ms. Tilton knowingly false assurances that if she were to voluntarily resign as collateral manager, MBIA would continue to recognize her rights of ownership in the underlying Portfolio Companies. A-44. In October 2015, during restructuring negotiations, MBIA sent her a proposal stating that even if Ms. Tilton were to "resign from all of [her] roles in relation to Zohar I and II," MBIA recognized that she would "retain [her] rights . . . in underlying Portfolio Companies." *Id*.

As referenced above, on November 22, 2015, Ms. Tilton and Patriarch

Partners XV commenced an involuntary bankruptcy proceeding against Zohar I. *Id*. During the negotiations to resolve this involuntary proceeding, MBIA and Mr. McKiernan continued to falsely assure Ms. Tilton that if she were to resign as collateral manager, she would continue to enjoy her rights with respect to the Portfolio Companies and that she would remain in her positions of control at the Portfolio Companies. A-44–45. Believing these assurances, Ms. Tilton voluntarily stepped down as the collateral manager of all three Zohar Funds, effective March 3, 2016. A-45. As alleged in the Amended Complaint, had Ms. Tilton known that MBIA's assurances were false, she would not have resigned as collateral manager. A-45–47.

## G. MBIA Directs US Bank to Sell the Zohar I Collateral in a Commercially Unreasonable Auction

In connection with Zohar I's November 2015 default, MBIA made insurance payments making whole the Class A-1 and A-2 noteholders. A-46. Under the Zohar I indenture, MBIA had the right to direct the liquidation of the fund's collateral to recoup its insurance payment. *Id*.

In June 2016, MBIA, as the Controlling Party of Zohar I under the Indenture, directed the Zohar I trustee, U.S. Bank ("US Bank"), to sell Zohar I's assets at auction. *Id*. At MBIA's direction, this auction purported to include Ms. Tilton's equity interests in the Portfolio Companies. MBIA and US Bank structured the auction so that MBIA could acquire the Zohar I collateral (including the equity

interests that MBIA had previously acknowledged belonging to Ms. Tilton) through a no-cash credit bid at an artificially low price. *Id.*

The auction structure that MBIA and US Bank originally devised would have taken place on September 15, 2016—within ten days of public notice—and would have only permitted bids for *all* of the Zohar I collateral collectively. *Id.* On September 12, 2016, Ms. Tilton, though Plaintiffs Patriarch XV and Octaluna I, commenced an action against MBIA and US Bank in New York state court seeking a temporary restraining order ("TRO") and preliminary injunction enjoining the auction. A-47.

Ms. Tilton's lawsuit principally objected to two features of MBIA's and US Bank's auction. First, MBIA had instructed US Bank to include Ms. Tilton's Portfolio Company equity in the collateral sale; Ms. Tilton maintained that the equity did not belong to Zohar I and therefore could not be included among the collateral to be sold at auction. *Id.* Second, Ms. Tilton alleged that US Bank had scheduled the auction to take place on a commercially unreasonable timeframe and in an otherwise commercially unreasonable manner, making it unlikely that any potential bidders would have enough time between the auction notice and sale to properly value the Zohar I collateral. *Id.* In MBIA's eyes these were features, not flaws, of the proposed auction, designed to allow MBIA to acquire Ms. Tilton's equity interests in the Portfolio Companies at a discount. *See id.*

On September 13, 2016, US Bank removed the action to the U.S. District Court for the Southern District of New York. *Id*. On September 14, 2016, Judge Sidney Stein granted the TRO, after which US Bank proposed certain changes to the auction's schedule and terms without dropping its assertion that the Zohar I collateral included Ms. Tilton's equity interests in the Portfolio Companies. *Id*. After a hearing on Ms. Tilton's motion for a preliminary injunction, Judge Jed Rakoff, to whom the case had been assigned, issued an order requiring US Bank to re-notice the auction to a "reasonably wide group of prospective bidders" and to allow the auction to remain open for at least thirty days. A-47–48. Judge Rakoff's order directed that US Bank conduct the auction on US Bank's modified terms in all other respects. A-48.

US Bank re-noticed the auction to take place on November 29, 2016, but a series of unilateral and court-ordered delays ensued. *Id*. At the Court's direction, the closing date for the auction was ultimately set for December 21, 2016. *Id*. MBIA's chosen liquidation agent, Duff and Phelps, failed to notify all potential bidders that the auction had been rescheduled in response to the Court's order, but only distributed a Notification of Rescheduling of Disposition to Assets to Zohar I and its noteholders, rather than a public bid package. *Id*. On the day before the December 21, 2016 auction date set by the Court, Duff and Phelps emailed a backdated auction notice to potential bidders in an attempt to paper over its failure to adequately notice the auction set to occur the following day. A-48–49. Thus,

potential bidders first received the operative Fourth Notice of Public Sale and Invitation to Bid on the afternoon before the auction. A-48.

The auction took place on December 21, 2016, over Ms. Tilton's objections. A-49. MBIA won the auction with a no-cash credit-only bid of approximately $149 million. A-49–50. Through this auction process, US Bank purported to transfer equity interests in more than twenty Portfolio Companies to MBIA. A-50.

## H.    MBIA and the Zohar III Controlling Class Launch a Litigation Campaign Against Patriarch

After MBIA secured Ms. Tilton's March 2016 voluntary resignation as the Zohar Funds' collateral manager under false pretenses, MBIA hired Alvarez & Marsal Zohar Management, LLC ("AMZM") to succeed Ms. Tilton as collateral manager of Zohar I and II. A-50. Even though MBIA had promised Ms. Tilton that she would participate in hiring her successor, MBIA prohibited Ms. Tilton from doing so, or providing any input in MBIA's decision to hire AMZM. A-50–51. As set forth in the Amended Complaint, the Zohar III Controlling Class also conspired with MBIA to appoint AMZM to succeed Ms. Tilton as Zohar III's collateral manager. A-51.

Relying on their authority under the Indentures, MBIA and Zohar III directed AMZM to pursue a campaign of unnecessary and costly litigations against Ms. Tilton. *Id*. As Plaintiffs allege in the Amended Complaint, these vexatious litigations served no legitimate purpose and depressed the value of the Zohar Funds by creating

24

a cloud of legal uncertainty around the Portfolio Companies. *Id.* The ultimate aim of the legal battles initiated at MBIA's and the Zohar III Controlling Class's behest was to drain Ms. Tilton of resources and seize control of her Portfolio Company equity. A-50–52.

The first step in this scheme was an April 2016 books-and-records action (the "B&R Action") brought by AMZM through the Zohar Funds against Patriarch in Delaware Chancery Court. A-52. The suit principally alleged that Patriarch breached certain provisions of the CMAs by failing to transfer certain documents and information that AMZM asserted were necessary to valuing the Portfolio Companies. *Id*. AMZM ultimately prevailed in the B&R Action, but much of the information that the Zohar Funds obtained was stale and not necessary to managing the Zohar Funds' collateral going forward. Defendants actually pursued the information to wrest control of the Portfolio Companies from Ms. Tilton. *Id*.

In October 2016, MBIA took the next step in its scheme by directing AMZM (through the Zohar Funds) to execute consents purporting to remove Ms. Tilton from her position as director of three Portfolio Companies she had successfully run for years. A-54. The consents also purported to replace her with AMZM's and MBIA's own unqualified and conflicted personnel. *Id*. The Zohar Funds' execution of these consents was premised on the proposition that the Zohar Funds, and not Ms. Tilton, were the exclusive owners of equity in the Portfolio Companies. *Id*.

25

Immediately following the execution of these consents, MBIA and the Zohar III Controlling class approved the Zohar Funds' November 2016 filing of a summary proceeding in Delaware Chancery Court (the "225 Action"). A-55. In this action, the Zohar Funds sought an order declaring that the consents executed the previous month rightfully removed Ms. Tilton from her positions at the Portfolio Companies. A-55–56. The Delaware Chancery Court ultimately found that the Zohar Funds were the beneficial owners of the Portfolio Company shares at issue, and that the Zohar Funds could therefore vote those shares in favor of Ms. Tilton's ouster. A-56. The Chancery Court, however, stayed its judgment pending appeal, finding that "Defendants have presented serious legal questions that present fair grounds for appeal," *Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. CV 12946-VCS (Del. Ch. Dec. 29, 2017), ECF No. 457, and Ms. Tilton remained in her positions at the Portfolio Companies at issue. Ms. Tilton's appeal of this decision was ultimately stayed due to Zohar Funds' Chapter 11 bankruptcy proceeding. A-56.[9]

While the Delaware 225 Action was pending, MBIA and the Zohar III Controlling Class took yet another step in MBIA's destructive litigation campaign by approving AMZM's filing of a civil RICO action against Patriarch in the United States District Court for the Southern District of New York (the "SDNY Action").

---

[9] In an effort to minimize the Portfolio Companies' litigation overhang, Ms. Tilton decided in March 2020 to no longer contest ownership of those Portfolio Company equity interests recorded in the Zohar Funds' names. A-56.

A-56–57. The action, which was in large part based on the same allegations as the SEC proceeding, sought over a billion dollars in damages. A-57. On December 29, 2017, the New York federal court granted Ms. Tilton's motion and dismissed the RICO allegations against Patriarch. *Id.*[10]

As alleged in the Amended Complaint, the litigation campaign brought by MBIA, AMZM, and the Zohar III Controlling Class caused needless harm to Ms. Tilton and the Portfolio Companies: "by filing lawsuits that embroiled the Portfolio Companies in litigation, publicly slandering the leadership of those Portfolio Companies (Ms. Tilton) with false allegations of fraud and mismanagement, and publicly disclosing the Portfolio Companies' confidential information, AMZM made third-party companies reluctant to conduct business with the Portfolio Companies, caused Portfolio Companies to lose business opportunities, and damaged the value of Plaintiffs' interests in the Portfolio Companies." A-58. These litigations were not undertaken with the best interests of the Portfolio Companies or the Zohar Funds in mind, but were instead designed to facilitate MBIA's acquisition of Ms. Tilton's equity interests in the Portfolio Companies. A-58–59.

---

[10] As described more fully below, Patriarch (defendants in the RICO action) also filed a third-party complaint against MBIA, AMZM, US Bank, and the Zohar III Controlling Class in this action. A-98.

## **LEGAL STANDARD**

Under § 510(c) of the Bankruptcy Code, "the Bankruptcy Court may, after notice and a hearing, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim under the principles of equitable subordination." 11 U.S.C. § 510(c). However, "three conditions must be satisfied before exercise of the power of equitable subordination is appropriate: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Schubert v. Lucent Tech., Inc.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 411 (3d Cir. 2009) (quoting *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699–700 (5th Cir.1977)) (internal quotations marks omitted).

There are "three general categories of behavior that may constitute inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego." *In re Optim Energy, LLC*, 527 B.R. 169, 176 (D. Del. 2015) (quoting *In re Epic Capital Corp.*, 290 B.R. 514, 524 (Bankr. D. Del.2003), aff'd, 307 B.R. 767 (D.Del.2004)) (internal citation marks omitted). However, the standard for determining whether conduct is inequitable "varies depending on whether the alleged bad actor is an 'insider' of the

debtor. When the claimant is an insider, the standard for finding inequitable conduct is much lower[,] . . . [and a] claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 81 (Bankr. D. Del. 2014) (quoting *In re Winstar*, 554 F.3d at 412) (internal quotation marks omitted). The Bankruptcy Code defines "insider" of a corporate debtor to include a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C § 101(31)(B). However, for purposes of equitable subordination, a party that does not meet the definition of "insider" under § 101(31)(B) may nevertheless be a "nonstatutory insider," subject to the same scrutiny, "even without actual control of the debtor, when there is a close relationship between debtor and creditor and when transactions between them were not conducted at arm's length." *State St. Bank & Tr. Co.*, 520 B.R. at 81 (citing *In re Winstar*, 554 F.3d at 396–97 (3d Cir. 2009)).

## ARGUMENT

### I.    The Bankruptcy Court Erred in Holding that MBIA's Conduct in the Zohar I Maturity Extension and Restructuring Negotiations Did Not Constitute Inequitable Conduct.

As detailed in the Amended Complaint, MBIA and Patriarch held extensive negotiations over a number of years regarding a potential extension of the Zohar I

maturity date. Plaintiffs allege that throughout these discussions, and indeed up to April 2015, MBIA consistently told Plaintiffs that their interests were aligned and that it supported a global restructuring of the Zohar Funds that would include (as a necessary first step) an extension of the Zohar I maturity date. Plaintiffs allege that MBIA knew these assurances to be false when making them, and that MBIA always secretly planned to allow Zohar I to default at maturity. Plaintiffs also explain why MBIA intentionally strung Ms. Tilton along with these false assurances for nearly three years: under financial distress, MBIA determined that the only way that it could mitigate the significant losses associated with the Zohar policies and its exposure to the Puerto Rico debt crisis was by allowing the funds to default and then using its post-default rights under the Zohar Indentures to wrest control of Ms. Tilton's equity interests in the Portfolio Companies.

The Bankruptcy Court deemed these allegations regarding MBIA's conduct in Zohar I restructuring negotiations to be implausible for three main reasons. *First*, the Bankruptcy Court stated that "Plaintiffs admit that MBIA represented to Ms. Tilton and her advisors over and over again that they supported a maturity date extension and global restructuring," that the Amended Complaint tells "a detailed story of the significant efforts made by all parties to reach agreement that spanned three years," and that "[t]here is no dispute that final terms for an extension and restructuring were never agreed upon." A-109. For this reason, the Bankruptcy Court

found that it "cannot conclude that [the Amended Complaint's allegations] indicate any untoward behavior on the part of MBIA or support the conclusion that it acted with an improper purpose." *Id*. That MBIA did not *openly* oppose a Zohar I extension until April 2015 or *overtly* undermine Ms. Tilton's efforts to achieve a consensual Zohar I restructuring is precisely the point of Patriarch's allegations. Plaintiffs do not allege that MBIA acted inequitably because it refused to agree to an extension of the Zohar I maturity or because it failed to assure that Ms. Tilton that it was willing to do so. Rather, Plaintiffs allege that MBIA acted inequitably by *deliberately misleading* Ms. Tilton with false assurances that it supported a Zohar I restructuring. MBIA's feigned willingness to negotiate a solution that would avoid a Zohar I default, but to which it would never actually agree, *is* the inequitable conduct alleged in the Amended Complaint.

In the same passage, the Bankruptcy Court suggests that Plaintiffs' allegations concerning Zohar I extension negotiations do not ascribe a plausible motive to MBIA during this period. That is, the Bankruptcy Court stated that is unreasonable to believe that "MBIA, when faced with serious financial distress, was intentionally 'stringing [Ms. Tilton] along' for three years with the false promise of a maturity extension and global restructuring in order to cause the Zohar I default and allow it to implement a plan to steal and sell her assets." *Id*. But there is nothing inherently implausible about MBIA's strategy as described in the Amended Complaint.

Stringing Ms. Tilton along was an essential part of MBIA's scheme to steal her assets because MBIA needed her to continue managing the Portfolio Companies and increasing their value. Indeed, "[t]he unique investment strategy of the Zohar Funds was heavily dependent on Ms. Tilton's ability to control the terms of repayment on the loans, as well as her control of, and active participation in, the rehabilitation of the Portfolio Companies from the inside—typically as the CEO or director or manager of the Portfolio Companies." A-20. MBIA's false assurances that it would ultimately consent to a Zohar I maturity extension served to keep Ms. Tilton in the dark about MBIA's ultimate strategy to seize her equity and to assure that she would continue to work to rehabilitate the Portfolio Companies and maximize the value of the Zohar I portfolio, actions which she would not have undertaken had she known that MBIA intended to induce a default and wrest control of the Portfolio Companies from her.

*Second*, the Bankruptcy Court stated that "the Amended Complaint's own allegations surmise a conflicting theory for MBIA's behavior - that MBIA believed it would be in a better position to achieve a consensual global restructuring of the Zohar Fund note obligations after Zohar I defaulted and MBIA paid the claims of the Class A-1 and A-2 notes and became subrogated to the insured noteholders." A-109. In support of this finding, the Bankruptcy Court cited to Paragraphs 125 and 126 of the Amended Complaint, each of which describe MBIA's "true strategy" with

respect to the Zohar I extension. *Id.* First, an October 9, 2015 Moody's report suggested that "MBIA had an interest in allowing Zohar I to default so that MBIA could gain certain 'rights and authority over the notes,' which MBIA believed 'would see them in a better position to take steps to mitigate their losses of a potential default of both the Zohar I and II CLOs.'" A-37. Second, a November 23, 2015 report by BTIG reported that MBIA Inc.'s President and CFO had told an analyst that if MBIA were required to pay a Zohar I claim, "we think that paying a claim will give us [i.e., MBIA] additional leverage to move the entire process toward a consensual restructuring prior to the maturity of Zohar II." *Id.*

These statements, however, do not present an inconsistent or "conflicting" theory for MBIA's actions during the Zohar I extension negotiations. Indeed, these statements *support and are consistent with* Plaintiffs' allegations that MBIA's assurances regarding its support for a consensual Zohar I extension and a global restructuring were issued under false pretenses. MBIA's own statements show that it saw the Zohar I default as a strategically valuable development. MBIA's statement that a Zohar I default and acquisition of the notes would "see them in a better position to take steps to mitigate their losses" is consistent with the theory that MBIA saw the acquisition of post-default rights over the Zohar collateral (including Ms. Tilton's equity) as the best possible route to recoup its losses on the Zohar I policy and mitigate losses in other parts of its portfolio. That MBIA, as of late 2015, only

contemplated executing this strategy with respect to the Zohar I notes does not show that the strategy laid out in the Amended Complaint is self-contradictory or inconsistent. It is coherent and plausible that MBIA's strategy would evolve in light of later events, including its declining financial position.

*Third*, the Bankruptcy Court stated that "it defies logic that MBIA would intentionally cause the Zohar Funds to default and allow itself to incur major losses that it allegedly knew it could not afford when facing its own liquidity crisis . . . ." A-109. This finding gives MBIA the benefit of the doubt, not Plaintiffs, who plausibly allege that in the face of severe financial challenges, MBIA adopted a high-risk, high-reward strategy. Based on its access to Portfolio Company financials and projections from Moelis through the restructuring negotiations, and on information it procured from the SEC, MBIA came to believe that the value of the Portfolio Companies exceeded (and perhaps greatly exceeded) its obligations to insure the Zohar I and II funds in the event of default. *See* A-43–46. For this reason, MBIA was willing to embrace a strategy that involved taking short-term insurance payout losses on the Zohar policies.

As described in the Amended Complaint, MBIA planned to, and did, use its post-default control over the Zohar Funds to aim for a long-term payout by acquiring Patriarch's equity interests in the Portfolio Companies. While this strategy may have been risky, it does not "defy logic" for MBIA to have viewed the Zohar I default's

34

long term upside potential—its acquisition of Patriarch's equity interests in the Portfolio Companies—as worth its near term costs. On a motion to dismiss, a court cannot weigh between competing plausible explanations of the allegations but must view all allegations in the light most favorable to the Plaintiff. *See Bagic v. Univ. of Pittsburgh*, 773 F. App'x 84, 88–89 (3d Cir. 2019) (On 12(b)(6) motion, the reviewing court "cannot weigh competing inferences and forgo drawing a reasonable one in the plaintiff's favor.").

## II. The Bankruptcy Court Erred in Holding That MBIA's Encouragement of an Unsubstantiated Enforcement Action Did Not Constitute Inequitable Conduct.

The Amended Complaint's allegation of MBIA's inequitable collusion with the SEC had two main components. First, MBIA supplied the SEC with misinformation regarding Ms. Tilton and the Portfolio Companies, leading to an unfounded SEC proceeding ultimately resolved wholly in Ms. Tilton's favor. Second, MBIA entered into a secret agreement with the SEC pursuant to which the SEC agreed to provide MBIA with the Portfolio Companies' confidential and proprietary information to which it was not otherwise entitled.

With regard to the first component of the SEC allegations, the Bankruptcy Court concluded that allegations concerning MBIA's provision of misinformation to the SEC failed to plausibly plead inequitable conduct by MBIA because Plaintiffs "do not provide any details regarding [MBIA's interactions with the SEC] and the

specific misinformation provided" and that even if the Court accepted that MBIA had made misrepresentations to the SEC, "there is no explanation that would suggest a causal connection between MBIA's actions and the SEC's independent judgment to commence an investigation and pursue an enforcement action." A-110.

The Bankruptcy Court's conclusions regarding the SEC misinformation allegations constitute reversible error in several respects. The Bankruptcy Court places an unwarranted burden on Plaintiffs to relate (prior to any discovery) the details of interactions between MBIA and the SEC that were by their very nature confidential and uniquely in the possession of MBIA. *See, e.g.*, *Tender Touch Rehab Servs., LLC v. Brighten at Bryn Mawr*, No. CIV.A. 11-7016, 2012 WL 993532, at *5 (E.D. Pa. Mar. 23, 2012) (holding that it would be "inappropriate to preclude Plaintiff from the discovery stage of the proceedings" on Rule 12(b)(6) motion, where the factual details underlying Plaintiff's allegations "are solely in the possession of Defendants"); *Krasner v. Rahfco Funds LP*, No. 11 CV 4092 VB, 2012 WL 4069300, at *8 (S.D.N.Y. Aug. 9, 2012) ("[W]here information is solely in the possession of the defendant, it would be unfair to require plaintiffs to plead facts which they cannot know until discovery"); *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1248 (2d Cir. 1987) (holding that allegations founded on belief appropriate where the "the factual information needed to fill out plaintiff's complaint lies peculiarly within the opposing parties' knowledge").

Lacking access to MBIA's communications with the SEC, Plaintiffs allege that MBIA had motive and an opportunity to provide misinformation to the SEC for the sake of encouraging an enforcement action, as an enforcement proceeding would limit Ms. Tilton's opportunities to achieve a consensual restructuring and usher in a default that would allow MBIA to seize control of the Zohar I collateral. An adverse finding may also have allowed MBIA to replace Ms. Tilton as collateral manager. *See* A-165–66, 183 (Zohar I CMA §§ 1.1, 5.3(a) (providing that the collateral manager may be removed for "Cause")). What is more, the SEC did ultimately pursue an unsuccessful proceeding that ended in Ms. Tilton's exoneration on all charges. Given MBIA's desire to hasten the Zohar Funds' default, its opportunity to achieve this result through clandestine communications with the SEC, and the fact that the SEC did pursue meritless charges against Ms. Tilton and Patriarch, it is eminently plausible that MBIA's misinformation influenced the SEC's decision to bring those charges.

The Bankruptcy Court's conclusions regarding the second component of the SEC allegations—the SEC's sharing of confidential materials with MBIA—err by offering at the pleading stage speculative alternative explanations for the events outlined in the Amended Complaint. First, the Bankruptcy Court stated that "Plaintiffs' own allegation of a secret deal is contradicted by their admission that the SEC was permitted to inform Ms. Tilton of the information sharing arrangement so

long as MBIA was given advance notice. There is no allegation that MBIA was able and did, in fact, prevent the SEC from revealing the arrangement with Ms. Tilton." A-111. But as Plaintiffs specifically allege in the Amended Complaint, the information-sharing agreement conferred benefits on MBIA because it was not a foregone conclusion that the arrangement would ever be disclosed and "MBIA was free to use the confidential documents to its advantage as long as those documents could not be traced back to the SEC." A-41–42. Further, that MBIA was ultimately unable to keep this information-sharing arrangement *absolutely* secret, because the SEC's legal and ethical obligations prevented MBIA and the SEC from doing so, does not absolve MBIA of culpability. That MBIA *attempted* to keep its arrangement with the SEC secret, by itself, is inequitable conduct that could support subordination.

The Bankruptcy Court also concluded that MBIA's receipt of confidential Portfolio Company information could not constitute inequitable conduct because MBIA had already determined the value of the Portfolio Companies based on substantial information it received from Ms. Tilton during negotiations surrounding a potential restructuring of the Zohar Funds. But the Bankruptcy Court's ruling that the information MBIA received from the SEC was duplicative of information it received from other sources, and that MBIA would have reached the same conclusion regarding the value of the Portfolio Companies regardless of whether it

had access to the information it received from the SEC, impermissibly draws inferences in favor of MBIA, and not Plaintiffs.

### III. The Bankruptcy Court Erred in Holding That Collateral Estoppel Barred Patriarch's Claims Regarding AMZM's Damaging Litigation Campaign and MBIA's Inducement of Ms. Tilton's Resignation As Collateral Manager.

As alleged in the Amended Complaint, AMZM (at the direction of MBIA and the Zohar III Controlling Class) engaged in a years-long campaign of destructive and bedeviling litigation against Patriarch, namely the B&R Action, the 225 Action, and the SDNY action. This campaign was not designed to vindicate the Zohar Funds' and Portfolio Companies' best interests, but was instead designed to "bleed [Ms. Tilton] dry, wrest control of the Portfolio Companies from Plaintiffs, and seize valuable Portfolio Company equity . . . ." A-51.

The Bankruptcy Court found that these allegations could not support a claim that AMZM, MBIA, or the Zohar III Controlling Class acted inequitably because the doctrine of collateral estoppel barred Appellants from making those allegations. A-100–101. The basis for the Bankruptcy Court's finding was an Opinion and Order (the "SDNY Order") issued on September 29, 2021 by Judge P. Kevin Castel of the United States District Court for the Southern District of New York in the matter *Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, No. 17-cv-00307-PKC (the "SDNY Action"). The SDNY Action was commenced by the Zohar Funds in January 2017; the Plaintiffs here subsequently filed a third-party complaint against

AMZM, MBIA, US Bank, Credit Value Partners, LP, Halcyon Capital Management LP, Coöperative Rabobank U.A., and Värde Partners, Inc., each of which are Defendants in this action.

In the SDNY Action, Patriarch alleged that AMZM breached its contractual duties under the Zohar Funds' Indentures and the CMA by aiding MBIA to prosecute sham litigation against Patriarch on behalf of the Zohar Funds. The SDNY Order held that these contractual claims were not plausible because the B&R Action and the 225 Action were each resolved in favor of the Funds: "[a] party successfully vindicating its rights can hardly be considered frivolous or a 'sham.'" *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 2021 WL 4460547, at *18 (S.D.N.Y. Sept. 29, 2021). The SDNY Order also held that the RICO allegations brought against Patriarch by AMZM in the SDNY Action were not a "sham" because "most of the claims in the instant litigation were dismissed due to lack of subject matter jurisdiction, not on the merits." *Id.* The Bankruptcy Court held that the SDNY Order's rulings on Patriarch's contractual claims with regard to AMZM's destructive litigation campaign against Appellants barred them asserting that the pursuit of these litigations constituted inequitable conduct.

Collateral estoppel prohibits the relitigation of issues decided in previous proceedings. Where the prior judgment given preclusive effect was rendered by a federal court, federal principles of collateral estoppel apply. *In re Docteroff*, 133

F.3d 210, 214 (3d Cir. 1997). For a bankruptcy court to find that collateral estoppel bars relitigation of a previous judgment, it must find that: "(1) the issue sought to be precluded must be the same as that involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment." *In re Ross*, 602 F.2d 604, 608 (3d Cir. 1979).

With regard to the first prong of the collateral estoppel analysis, the party "asserting that another party is collaterally estopped on a particular point has the burden of demonstrating that the issue on which he contends that other party is estopped was raised in the prior proceeding and was identical to the issue in the present proceeding." *Freedman v. Redstone*, 753 F.3d at 425. Unless "every aspect of the issue involved is identical in both proceedings," issue preclusion does not apply. *In re Astroline Commc'ns Co.*, 226 B.R. 324, 328 (Bankr. D. Conn. 1998) (citing *Grogan v. Garner*, 498 U.S. 279, 286 n.12 (1991)). Indeed, collateral estoppel is only applicable in situations where a prior judgment determines factual issues using identical standards. *See Brown v. Felsen*, 442 U.S. 127, 139 n.10 (1979) ("If, in the course of adjudicating a state-law question, a state court should determine factual issues *using standards identical* to those of [the bankruptcy code], then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court." (emphasis added)). "Reasonable

doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel." *Gregory v. Chehi*, 843 F.2d 111, 121 (3d Cir. 1988).

Here, the Bankruptcy Court erred in holding that Defendants satisfied the first prong of the issue preclusion test because there was not complete identity between the issue determined in the SDNY Action and the issue posed by Plaintiffs' equitable subordination claim. In this respect, the Connecticut Bankruptcy Court's decision in *In re Astroline* is instructive. In *Astroline*, the debtor's bankruptcy trustee brought an equitable subordination proceeding against a defendant creditor who was a limited partner of the debtor. 226 B.R. at 326. In a prior proceeding before the same bankruptcy court, the court had found that as a matter of Massachusetts state law, the defendant creditor had not exercised a sufficient degree of control over the debtor to be treated as a general partner as a debtor. *Id.* at 327. In the subsequent equitable subordination proceeding, the defendant creditor argued that the previous decision barred the trustee from asserting that the defendant was an "insider" of the debtor for the purposes of the equitable subordination analysis. *Id.* The court noted that the Massachusetts state law standards applicable in the prior proceeding governing whether the defendant would be treated as a general partner of the debtor were *narrower* than the standards governing whether the defendant qualified as an "insider" under the bankruptcy code. For this reason, the prior determination did not estop the trustee's claims in the later proceeding:

> while a finding in [the previous proceeding] that the Defendant
> exercised control as a general partner of the Debtor would have been
> sufficient to consider the Defendant an "insider" for bankruptcy
> purposes . . . the converse does not follow; not having exercised control
> as a general partner does not necessarily imply that one is not an
> "insider," since that term, as defined in the Bankruptcy Code includes,
> but is not limited to, general partners . . . . The broader issue of whether
> the Defendant was an insider was not litigated in the prior proceeding.

*Id.* at 327–28. In other words, "[u]nless every aspect of the issue involved is identical
in both proceedings . . . a prior finding that one did *not* meet the requirements of the
more restrictive criteria would not preclude relitigation of the broader issue in the
subsequent proceeding." *Id.* at 328 (citing *Grogan*, 498 U.S. at 286 n.12). The
*Astroline* court noted that while many of the same facts that were relevant to the
issue determined in the prior proceeding would also be relevant in determining the
question of the defendants' insider status, the different standards applicable to those
facts ruled out the application of collateral estoppel in the later proceeding. *Id.*
at 328.

*Astroline*'s reasoning applies here. The standards governing Patriarch's
breach-of-contract claims against AMZM in the SDNY Action were narrower than
those applicable in this equitable subordination proceeding. To prevail in the SDNY
Action, Patriarch needed to show that AMZM breached the indentures and/or CMAs
and damages flowing from that breach. In the instant action, however, the applicable
standard is broader because the range of conduct justifying equitable subordination
is considerably broader, encompassing behavior that violates the "rules of fair play

43

and good conscience." *Pepper v. Litton*, 308 U.S. 295, 310 (1939). For insiders like AMZM, equitable subordination "requires only material evidence of unfair conduct or, any unfair act by the creditor as long as the conduct affects the bankruptcy results of the other creditors." *In re Ashinc Corp.*, 629 B.R. 154, 217 (Bankr. D. Del. 2021) (internal quotation marks omitted). This standard is considerably broader than the standard applied to Patriarch's breach-of-contract claims in the prior SDNY action. Indeed, bankruptcy courts have explicitly recognized that conduct that does not otherwise constitute breach of contract may serve as the basis for equitable subordination in bankruptcy. *See In re Winstar*, 554 F.3d at 412–13 (holding that defendants' coercion of debtor into a series of transactions that were not in the debtors' best interest constituted inequitable conduct, even though defendant acted in accordance with the parties' contractual obligations); *O'Halloran, et al. v. Prudential Savings Bank* (*In re Island View Crossing II, L.P.*), 604 B.R. 181, 203 (E.D. Penn. 2019) (recognizing that "enforcement of a contract can inch over into inequitable conduct"). For this reason alone, the Bankruptcy Court's application of collateral estoppel to Patriarch's litigation claims was erroneous.

Further, collateral estoppel is appropriate only where determination of the issue was "essential to the prior judgment." *In re Ross*, 602 F.2d at 608. The SDNY Order did not address, much less determine, the Amended Complaint's allegations that AMZM's purposes in pursuing its litigation campaign against Patriarch were

illegitimate—that AMZM's pursuit of these claims was solely designed to harass and harm Plaintiffs. The SDNY Order simply stated that AMZM's litigations were not a "sham" in the sense that they were not legally frivolous. The SDNY Order's silence on the issue of AMZM's motives in this subsequent equitable subordination proceeding is essential here, as vexatious and protracted litigation tactics may justify equitable subordination. *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 235 (3d Cir. 2003) ("Although the pursuit of one's legal rights may not be grounds for equitable subordination, protracted and unjustified litigation tactics . . . may justify subordination.").

In a footnote, the Bankruptcy Court infers that the SDNY Order implicitly addressed the issue of AMZM's improper purposes because it determined that the litigations were not a "sham":

> Judge Castel determined the issue that this Court would be tasked with deciding here if the proceeding were to continue – namely, whether the litigation pursued by AMZM was a sham; in other words, whether it was brought for a legitimate purpose or to abuse or for some other improper purpose. Faced with Plaintiffs' same arguments regarding the Defendants' motivations, His Honor answered that question based on the objective merits of the litigations and determined that nothing was a sham.

A-100. But nothing in the language or reasoning of the SDNY Order itself suggests that its determination that the litigations were a not a "sham" rested on anything *other* than its determination that the actions were not legally frivolous. *See* A-153. ("A party successfully vindicating its rights can hardly be considered frivolous or a

45

'sham.'"); *id.* (dismissal of RICO claims did not support claim that the action was a "sham" because "though this Court has concluded that some of those predicate acts run afoul of the RICO Amendment, such a determination does not render the claim immaterial, insubstantial, or frivolous" (citation omitted)). And, of course, a determination that AMZM's claims were legally nonfrivolous does not in any way rule out the possibility that the litigations were, as Plaintiffs allege, brought to harass and harm Ms. Tilton.

The Bankruptcy Court's suggestion that the SDNY Order determined the issue of AMZM's motivations simply because the court was "[f]aced with Plaintiffs' same arguments regarding the Defendants' motivations" is incorrect as a matter of law. Collateral estoppel requires that the determination of the issue be "essential to the judgment," not that the previous decision considered the same arguments. Insofar as it is ambiguous whether the SDNY Order addressed the issue of AMZM's motivations, that ambiguity should be resolved in Appellants' favor. *See Gregory v. Chehi*, 843 F.2d at 121 ("Reasonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel[.]").

The same arguments apply with equal force to the Bankruptcy Court's conclusion that the SDNY Order bars Plaintiffs from alleging that MBIA inequitably induced Ms. Tilton to voluntarily resign as collateral manager of the Zohar Funds by making false representations regarding its willingness to recognize Ms. Tilton's

ownership rights over the Portfolio Companies. The SDNY Order considered these allegations in the context of Plaintiffs' claims for fraud, negligent misrepresentation, and promissory estoppel, and found that they were not sufficiently definite to meet the pleading standards for those causes of action. But even if MBIA's representations regarding Ms. Tilton's rights to the Portfolio Company equity were not sufficiently concrete to meet the pleading standards in the previous actions, the SDNY Action's determination does not foreclose the possibility that they were nevertheless misleading.

## IV. The Bankruptcy Court Erred in Holding That US Bank's and MBIA's staging of the Commercially Unreasonable Zohar I Auction Did Not Constitute Inequitable Conduct.

The Bankruptcy Court held that the allegations regarding the Zohar I collateral sale process could not support equitable subordination because Patriarch had the opportunity to challenge the commercial reasonableness of the auction before Judge Rakoff, remarking that "Plaintiffs had ample opportunity to challenge the commercial reasonableness and scope of the Zohar I Auction" and "the Amended Complaint contains no allegations that US Bank failed to follow Judge Rakoff's orders . . . ." A-95.

However, the fact that US Bank's and MBIA's efforts to conduct the auction on blatantly unfair terms were ultimately thwarted by Ms. Tilton's legal challenges does not undermine the Amended Complaint's allegations of inequitable conduct.

The conduct complained of was that US Bank and MBIA *sought* to dispose of the Zohar I collateral in a way that was designed to advantage MBIA at the expense the Zohar Funds and Ms. Tilton.

The Bankruptcy Court appears to acknowledge, to a certain extent, that the issue raised by the Amended Complaint was that the original terms of the auction were insufficient and that the Appellants had to expend significant time, effort, and legal resources to prevent US Bank and MBIA from executing the auction as originally planned. *Id.* But the Bankruptcy Court concludes that such allegations are insufficient as to US Bank because "MBIA (not US Bank) was the party entitled under the Indentures to direct the liquidation of the Zohar I assets securing its defaulted note obligations . . . ." A-96. With regard to MBIA, the Bankruptcy Court simply states that "even if MBIA tried to pursue a commercially unreasonable auction process so that it could depress bidding for the Zohar I collateral, Judge Rakoff prevented that result through his oversight. Accordingly, there was no harm except for the incurrence of legal fees." A-107. However, the question of whether Judge Rakoff's oversight ensured a fair and adequate disposition of the collateral is a factual question that cannot be resolved on a motion to dismiss, given the Amended Complaint's allegations to the contrary. Even accepting that Judge Rakoff's oversight guaranteed a commercially reasonable auction, the Bankruptcy Court's account of these events shows that MBIA acted inequitably by attempting to stage a

commercially unreasonable auction for its own benefit and inflicted pecuniary harm on Ms. Tilton in the form of legal fees as a result.

The Bankruptcy Court also held that Plaintiffs' allegations that the auction process depressed the value of the Zohar I collateral to MBIA's benefit were not plausible because Ms. Tilton failed to exercise her "last look right" under the Zohar I Indenture, which authorized Octaluna I to "purchase the auctioned assets at a price equal to or greater than MBIA's offer." A-96. The Bankruptcy Court went on to state that "[a] reasonable person would expect Ms. Tilton, a sophisticated party who claimed her collateral and property were being sold against her will at a 'fire-sale price', to have exercised such a right through Octaluna I, but she did not." *Id.*

However, the reasoning and motivation behind Ms. Tilton's decision not to exercise her first-look rights though Octaluna I are issues of fact that cannot be resolved against Plaintiffs on a motion to dismiss. Ms. Tilton had any number of reasons for not purchasing the assets at the artificially low price resulting from the auction. For example, Ms. Tilton, unlike MBIA, would not have been able to credit bid for the Zohar I collateral and instead would likely have had to raise capital in order to exercise that right. Or it may have been that the sale price reflected US Bank's insistence (over Ms. Tilton's objections) that the collateral included equity interests in the Portfolio Companies, and matching MBIA's bid would have required Ms. Tilton to pay the Zohar Funds to acquire assets that (by her own lights) were

*already hers.* Whatever the reason, the Order's determination that Ms. Tilton must have declined to exercise her first look rights because the assets were not, in fact, undervalued impermissibly resolved factual issues in Defendants' favor.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellants respectfully request that this Court reverse the Order.

Dated: May 16, 2022                **COLE SCHOTZ P.C.**

By: */s/  G. David Dean*
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

– and –

**SHER TREMONTE LLP**
Theresa Trzaskoma (*pro hac vice*)
Max Tanner (*pro hac vice*)
Wesley Erdelack (*pro hac vice*)
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtanner@shertremonte.com
werdelack@shertremonte.com

*Counsel to Appellants*

50

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. Bankr. P. 8015(h), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. Bankr. P. 8013(f)(3)(A).

1. Exclusive of the exempted portions of the brief specified in Fed. R. Bankr. P. 8015(g), the brief contains 12,050 words.

2. The brief has been prepared using Microsoft Word. The undersigned has relied upon the word count feature of this word processing software in preparing this certificate.

Dated: May 16, 2022

/s/ *G. David Dean*